IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 2:16-CR-072-D |
| | § | |
| ARTURO SALAZAR JR. | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Arturo Salazar Jr. ("Salazar") moves to suppress and preclude the government from introducing as evidence at trial contraband (24 bundles of a substance alleged to be methamphetamine) seized during a November 4, 2016 traffic stop, and all evidence, photographs, and statements made by Salazar. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On November 4, 2016 Max Honesto ("Trooper Honesto"), a trooper employed by the Texas Department of Public Safety ("DPS"), was on patrol on Interstate Highway 40 ("I-40") in Carson County, Texas. I-40 is a known high drug trafficking corridor. Trooper Honesto has been a DPS trooper for more than 14½ years, and he has 2½ years of prior experience as a local police officer. In both positions he has had experience interdicting narcotics. As

---

[1] Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

a DPS trooper, he has served for approximately two years as an instructor of other officers and law enforcement agencies. Trooper Honesto has made more than 100 traffic stops resulting in narcotics seizures, including approximately 80 drug interdictions on I-40.

On November 4, 2016, at approximately 4:57 p.m., Trooper Honesto was traveling westbound on I-40 near mile marker 96 in Carson County, when he observed a silver 2012 Nissan Maxima ("Maxima") traveling eastbound that appeared to be speeding. The radar in Trooper Honesto's DPS unit clocked the vehicle at 81 m.p.h. when the posted speed limit was 75 m.p.h.

Trooper Honesto did a U-turn and pursued the speeding Maxima, which was traveling in the left-hand (passing) lane. As Trooper Honesto approached the Maxima, the driver changed from the left-hand lane to the right-hand lane, in front of a semi-truck, and then exited the freeway at the first available exit. Trooper Honesto moved in behind the semi in case the driver of the Maxima exited the freeway. When the Maxima did exit, Trooper Honesto took the same exit, activated his emergency lights, and effected a traffic stop based on the speeding violation. According to Trooper Honesto, it is suspicious when a driver takes the first exit. In his experience, narcotics traffickers attempt to avoid police contact, and it is common that they try to get off the highway at the very next exit.

After effecting the traffic stop, Trooper Honesto observed that the Maxima bore an Arizona specialty license plate. He ran the plate and learned that the vehicle was registered to someone named Sylvia Camarillo. Based on Trooper Honesto's experience, it is common for drugs to be transported in a vehicle owned by a third party who is not an occupant of the

vehicle. Arizona is a known source of narcotics, and Trooper Honesto has stopped several people on I-40 who were traveling from Arizona and transporting drugs.

Trooper Honesto approached the vehicle from the passenger side, speaking first to the driver (Salazar) and then with the passenger, later identified as Taylor Willoughby ("Willoughby"). After identifying himself, Trooper Honesto told Salazar to "watch your speed, alright?" At that point, Trooper Honesto first noticed that Salazar appeared to be sweaty. Salazar and Willoughby informed Trooper Honesto that Salazar was trying to get to a restroom.

Trooper Honesto asked Salazar for his license and proof of insurance. He also asked Salazar to step out of the vehicle. Trooper Honesto asked Salazar in Spanish whom the vehicle belonged to, and Salazar responded that it belonged to his wife. Trooper Honesto informed Salazar that he would try to be quick since Salazar needed to use the restroom.

After Salazar exited the vehicle, Trooper Honesto questioned Willoughby about a radar detector that, based on the presence of a suction cup mark, appeared to have been removed from the windshield. The radar detector was situated on the floorboard and was beeping. At that point in time, Trooper Honesto considered the driver's decision to take the first exit and to use a radar detector to be suspicious conduct.

In response to Trooper Honesto's questions, Willoughby advised that she and Salazar were just friends, that she had known him a couple of months, and that she "thought" he worked with the railroad. She stated that she was a school nurse who had some time off of work because she had just had surgery. Willoughby said that she and Salazar were on their

- 3 -

way to Oklahoma because "his friends are over there." When Trooper Honesto mentioned Salazar's wife, Willoughby seemed surprised to learn that he was married. In Trooper Honesto's experience, it is common for two people who do not know each other to transport drugs. It was suspicious that the vehicle was registered to a third person who was not present, and that Willoughby did not know that Salazar was married.

Trooper Honesto then met separately with Salazar. As Trooper Honesto approached his DPS unit, he observed that Salazar had left on the right turn signal on the Maxima. Trooper Honesto interpreted this as a sign of a high level of nervousness—an indication that Salazar's mind was on something else. He also noticed sweat beads on Salazar's forehead, and he asked Willoughby about that.

After Trooper Honesto requested that Salazar have a seat in his DPS unit, he asked Salazar how he was doing and why he was sweating so badly. Salazar responded that he was not sweating and that he was doing fine. Trooper Honesto also asked Salazar where they were traveling to, and Salazar responded that they were going to Kansas City so that he could work for the railroad. Trooper Honesto considered it suspicious that Willoughby had said they were traveling to Oklahoma to visit Salazar's friends there, and that Salazar said they were traveling to Kansas City so that he could work for the railroad, without mentioning a visit to friends. Additionally, Salazar told Trooper Honesto that Willoughby was a friend of his who had come along for the ride so that he would not fall asleep, and that she was a school nurse who was not working because she had been suspended due to an incident with a child. But Willoughby had said she was on vacation. Salazar said three times that he was

- 4 -

going to Kansas City, and he never mentioned Oklahoma or visiting friends. In Trooper Honesto's experience, it is common for persons transporting drugs to give conflicting stories about their plans.

When Trooper Honesto asked Salazar if he was married, Salazar responded that he was separated. Trooper Honesto found it suspicious that the Maxima was registered to a person whose last name and address were different from Salazar's. And in response to Trooper Honesto's question about whether Salazar was married, Salazar volunteered information about the length of his marriage and the number of children and grandchildren he has. In Trooper Honesto's experience, conduct of this type (i.e., giving more information than is requested) is indicative of someone who is trying to distract the officer and get the stop over with.

When Trooper Honesto asked Salazar if he had ever been arrested, Salazar responded that he had received another speeding ticket but that he had never been arrested. When Trooper Honesto then contacted Amarillo DPS dispatch to request that they check on Salazar's criminal history, Salazar became more dramatic in his complaints about his stomach ailment. Trooper Honesto noticed that Salazar was moving around and had a strange expression on his face. Trooper Honesto asked Salazar, "What's the matter, man," and Salazar responded that he had eaten a burrito in Albuquerque and did not feel well. Trooper Honesto found this to be suspicious because, at this point, Salazar was over 200 miles from Albuquerque and had traveled through numerous places where he could have stopped to use the restroom. When Trooper Honesto joked about Willoughby's being a

- 5 -

nurse, Salazar laughed loudly and in a way that Trooper Honesto believed was fake.

Trooper Honesto then asked Salazar what the passenger's name was. Salazar provided her first name, but stated that he did not know her last name and had just met her about two weeks prior. This conflicted with Willoughby's statement that she and Salazar were friends and had known each other for two months. Trooper Honesto found it suspicious that Salazar and Willoughby had not known each other long (and Salazar did not even know Willoughby's last name) because, in his experience, individuals who travel together trafficking narcotics typically do not know a lot about each other.

Amarillo DPS dispatch then informed Trooper Honesto that Salazar had a felony evading arrest offense and issuing a bad check offense on his record. Salazar had previously informed Trooper Honesto that he had never been arrested. In Trooper Honesto's experience, it is common for drug traffickers to lie about their criminal history. Trooper Honesto then asked Salazar whether he had any luggage, to which Salazar responded, in Spanish, "everything's okay." This is a common response that drug traffickers give to police questioning.

After Salazar's criminal history came back from dispatch, his level of anxiety increased. He started making a noise and moving around, and Trooper Honesto told Salazar to calm down and that he was acting too nervous. Salazar responded that he was not nervous, and he started complaining about his stomach. Salazar then asked, "do you think they'll let me use the restroom here?" which Trooper Honesto interpreted as an attempt to hurry along the traffic stop. In Trooper Honesto's experience, persons who are stopped for traffic

- 6 -

offenses and express a need to use the restroom are not as dramatic in their conduct as was Salazar.

Trooper Honesto then printed and requested that Salazar sign a warning ticket, and he returned Salazar's documents to him. Rather than conclude the traffic stop, however, Trooper Honesto continued talking with Salazar because he had by now developed reasonable suspicion, based on the totality of the circumstances, that Salazar was transporting contraband. Trooper Honesto developed this reasonable suspicion based on the following: Salazar was traveling cross-country with Willoughby, and they did not know much about each other; Salazar was evasive when answering questions; the Maxima bore Arizona license plates, and Salazar resided in Arizona; Salazar was overly friendly, he volunteered information, and he attempted to assure Trooper Honesto that everything was fine; Salazar and Willoughby gave conflicting stories regarding their destination; Salazar was sweating; Salazar left the turn signal on when he exited his vehicle; Salazar's stomach distress increased after his criminal history came back; Salazar was driving a vehicle registered to a third party; Salazar's wife had a different last name and address; and Salazar took the very first exit off I-40 after Trooper Honesto U-turned and pursued his vehicle.

Trooper Honesto asked Salazar if there was anything illegal in the car, whether he was transporting drugs, and who was responsible for what was inside the vehicle. After Salazar denied that he was transporting drugs or even used drugs (and stated that he could be given a drug test), Trooper Honesto asked Salazar for consent to search the vehicle, which Salazar refused.

Trooper Honesto then told Salazar to sit right there and requested a narcotics detection canine unit because Salazar had refused consent. Salazar then said, "Okay, you guys can search the car." Trooper Honesto explained to Salazar that he had already refused consent. Salazar then informed Trooper Honesto that there was a pipe and "shit" that he took responsibility for located on the driver's side. Trooper Honesto asked "what kind of stuff," and Salazar informed him that he was talking about methamphetamine, which he used to stay awake. Trooper Honesto believed at this point that he had developed probable car to search the Maxima.

Trooper Honesto asked Salazar, "do you feel that you had to say that [i.e., give consent to search the vehicle] because I said a dog was coming," and Salazar replied, "yes, sir." Trooper Honesto felt that, although he had already developed probable cause for the search, he wanted the canine unit because he did not want Salazar to feel he had been coerced into giving his consent to the search. Salazar then volunteered that there was stuff in the trunk of the vehicle, too, and that the passenger did not have anything to do with it. Salazar told Trooper Honesto to just take it out and arrest him. He also remarked to Trooper Honesto, "you guys are f—ing good." Trooper Honesto then read Salazar his *Miranda* rights because of the statements Salazar was making.

About 30 minutes after the traffic stop concluded, DPS Trooper Jerome Ingle ("Trooper Ingle") and his narcotics detection canine arrived on the scene. Trooper Ingle used the canine to conduct a free-air sniff of Salazar's vehicle, and the canine alerted to the presence of narcotics. Based on the canine's alert, Trooper Honesto searched the vehicle.

He located a glass pipe and crystal-like substance residue in a bag in the driver's side door. He also located 24 bundles in the trunk of the vehicle. The bundles field tested positive for the presence of methamphetamine and had a gross weight of 25 pounds. The DEA South Central Laboratory later confirmed that the substance was in fact methamphetamine, with a net weight of 10,757 grams.

Salazar moves to suppress and preclude the government from introducing as evidence at trial the contraband (24 bundles of a substance alleged to be methamphetamine) seized during the traffic stop, and all evidence, photographs, and statements made by Salazar. The government opposes the motion.

## II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id.* (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception comes from *Terry v. Ohio*, 392 U.S. 1 (1968).

The framework articulated in *Terry* is used to analyze the legality of a traffic stop.

"Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). "A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). As this court has previously explained:

> For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.

*United States v. Johnson*, 2006 WL 1041148, at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.)

- 10 -

(quoting *Lopez-Moreno*, 420 F.3d at 430).

Although "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted). Accordingly, "[t]he government bears the burden of establishing by a preponderance of the evidence [the] two elements under *Terry*[.]" *Johnson*, 2006 WL 1041148, at *3 (citing *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992)).

### III

Salazar does not dispute that Trooper Honesto had an initial justification stop him for speeding.[2] Instead, he argues, under the second prong of *Terry*, that his continued detention after the completion of the purpose of the stop was unconstitutional.

### A

Under the second prong of *Terry*, the court asks whether Trooper Honesto's actions after stopping Salazar's vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382

---

[2]Although at the evidentiary hearing Salazar's counsel asked a handful of questions regarding the basis for the stop itself, he appears to adhere to the position taken in his motion that the first prong of the *Terry* inquiry is not at issue. *See* D. Br. 2 ("Salazar does not challenge the initial stop, which was based on the Trooper's observation that he was speeding.").

F.3d at 507. "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010); *see also United States v. Spears*, 636 Fed. Appx. 893, 901 (5th Cir. 2016) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." (citing *Rodriguez v. United States*, ___ U.S. ___ , 135 S.Ct. 1609, 1615 (2015); *Pack*, 612 F.3d at 350)). If, however, "the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (alterations in original) (quoting *Pack*, 612 F.3d at 350). As explained above, "[r]easonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officer[s]." *Id.* at 631-32 (citation omitted).

B

Salazar contends that, at the point Trooper Honesto returned Salazar's driver license and registration to him and Salazar declined Trooper Honesto's request for consent to search the vehicle, the "mission" of the stop was complete, and, absent reasonable suspicion, Trooper Honesto could not detain Salazar any longer. In closing argument at the hearing, Salazar attempted to undercut the government's assertion that Trooper Honesto had developed reasonable suspicion. In sum, his counsel maintained that reasonable suspicion is an objective standard, and that, for the following reasons, it was objectively unreasonable for Trooper Honesto to base his reasonable suspicion on the grounds to which he testified: a reasonable officer could not confuse Salazar's signs of gastrointestinal distress—including audibly passing gas while seated with Trooper Honesto in the DPS unit—for nervousness; discovery of drugs following an illegal search cannot be used to corroborate the officer's reasonable suspicion; the inconsistent stories of Salazar and Willoughby regarding how long they knew each other were not inconsistent enough; it was not sufficiently inconsistent for Willoughby to state that they were traveling to Oklahoma rather than Kansas City when one must travel through Oklahoma to get to Kansas City; the decision in *United States v. Pack* is distinguishable because it was focused on inconsistent statements regarding the place of departure rather than the place of arrival, and in *Pack* the travelers also changed their stories; and the other factors on which Trooper Honesto relied became mere hunches without the predicate grounds of inconsistent stories and nervousness. Salazar also offers arguments to support his contention that the grounds on which Salazar relied were not objectively

- 13 -

reasonable.

C

Salazar's motion turns on whether, considering the totality of the circumstances, Trooper Honesto had developed reasonable suspicion of additional criminal activity before DPS dispatch returned Salazar's criminal history, Trooper Honesto issued the warning ticket, and he returned Salazar's documents to him. If he did, Trooper Honesto could further detain Salazar for a reasonable time while attempting to dispel this reasonable suspicion. *See Andres*, 703 F.3d at 833. In this case, the detention interval to be justified is short indeed. This is so because, as the court explains below, within minutes of issuing the warning ticket and returning Salazar's documents to him, Trooper Honesto had probable cause to search the vehicle based on Salazar's admission that he possessed methamphetamine in the vehicle and drugs in the trunk.

The government proved by a preponderance of the evidence that Trooper Honesto developed reasonable suspicion of additional criminal activity after effecting the traffic stop and before DPS dispatch returned Salazar's criminal history, Trooper Honesto issued the warning ticket, and he returned Salazar's documents to him.

Trooper Honesto has extensive experience in narcotics interdiction, including more than 100 traffic stops that have resulted in narcotics seizures, including approximately 80 drug interdictions on I-40. He has served for approximately two years as an instructor of other officers and law enforcement agencies in narcotics interdiction. I-40 is a known high drug trafficking corridor.

- 14 -

In Trooper Honesto's experience, it is common for narcotics traffickers to attempt to avoid police contact by attempting to get off the highway at the very next exit when they observe the presence of police.  It is also common for drug traffickers to operate vehicles owned by third parties who are not occupants of the vehicle.  Arizona (where the Maxima was registered) is a common source of drugs that are transported on I-40, and Trooper Honesto has stopped several people on I-40 who were traveling from Arizona and transporting drugs.

In response to Trooper Honesto's questions, Salazar and Willoughby gave conflicting stories about such basic information as where they were going (Salazar said Kansas City, Willoughby said Oklahoma), why they were traveling there (Salazar said for work, Willoughby said to visit Salazar's friends), and how long they had known each other. Willoughby did not know Salazar was married.

Salazar exhibited several signs of nervousness, including sweating, leaving on his turn signal when he exited the vehicle, providing more information than was requested of him, acting overly friendly, reassuring Trooper Honesto that everything was fine, acting overly dramatic about his need to use the restroom, and attempting to hurry the traffic stop to completion.

Salazar essentially attempts to undercut the government's showing of reasonable suspicion by challenging the objective reasonableness of Trooper Honesto's conclusions that Salazar was acting nervously and that Salazar and Willoughby had given inconsistent stories. He maintains that once these grounds are removed from the equation, the government is left

- 15 -

with grounds that are nothing more than impermissible hunches. In support of this reasoning, Salazar posits that a reasonable officer would not have interpreted Salazar's clear gastrointestinal distress (which included sweating, walking carefully to the police car, holding his stomach, patting his bottom, wincing, fidgeting, breathing heavily, and passing gas) as a sign of "extreme nervousness." He also maintains that his and Willoughby's stories were not inconsistent enough.

The court disagrees that the stories given by Salazar and Willoughby about very basic information are not sufficiently inconsistent,[3] particularly when evaluated as components of the totality of the circumstances. Regarding Salazar's conduct that Trooper Honesto attributed to nervousness, the relevant inquiry is not whether Salazar was actually nervous (or, instead, just had to use the restroom); rather, it is whether he appeared to be nervous from the perspective of a reasonable officer based on the totality of the circumstances. Further, assuming it was a mistake for Trooper Honesto to interpret Salazar's behavior as signs of nervousness, an officer's reasonable mistake of fact can still give rise to reasonable suspicion. *See, e.g., United States v. Cotton*, 782 F.3d 392, 395-96 (8th Cir. 2015) ("Further,

---

[3]Salazar argued that his and Willoughby's stories about their travel were not inconsistent because the most direct route to Kansas City would have been through Oklahoma, and when Willoughby stated that they were going to Oklahoma, she could have meant that Oklahoma was their immediate, as opposed to final, destination. The court rejects this argument. When Trooper Honesto asked Willoughby were they were going, she stated that they were going to Oklahoma and that "his friends are over there." It was reasonable for Trooper Honesto to conclude that Willoughby's statement indicated that she and Salazar were not merely passing through Oklahoma, but, rather, that Oklahoma was their final destination, where Salazar had friends.

assuming it was a mistake for the officers to assume Cotton and the unidentified individual were companions, an officer's reasonable mistake can still give rise to reasonable suspicion." (citation omitted)); *United States v. Karam*, 496 F.3d 1157, 1164 (10th Cir. 2007) (agreeing with district court that, even if trooper's belief that suspect made a false statement was mistaken, it was objectively reasonable for trooper to believe suspect had made the false statement, and "viewing the facts as [the trooper] reasonably perceived them to be, [the suspect]'s statement certainly contribute[d] to an objectively reasonable and articulable suspicion necessary to justify the prolonged detention.").  And even if the court completely disregards the behavior that Salazar maintains is a sign of his need to use the restroom rather than of nervousness, there are other factors—detailed above—that, viewed in totality, provided "reasonable suspicion of additional criminal activity."  *Pack*, 612 F.3d at 350.

Salazar contends that it was unreasonable to prolong the traffic stop after he denied Trooper Honesto consent to search his vehicle.  But at the point Salazar denied Trooper Honesto's request for consent to search the vehicle, Trooper Honesto had already developed reasonable suspicion (for the reasons explained above) of additional criminal activity.  And while Trooper Honesto was further questioning Salazar in order to dispel that suspicion, Salazar confessed that he had methamphetamine in the vehicle.[4]  It is clearly established that "[a]n exception to the Fourth Amendment's warrant requirement exists when a police officer has probable cause to search an automobile for contraband."  *United States v. Powell*, 732

---

[4]Salazar did not argue in his brief or during the suppression hearing that his confession was coerced or obtained in violation of his *Miranda* rights or any other constitutional rights.

F.3d 361, 372 (5th Cir. 2013) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973)). "Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed." *United States v. Carrillo-Morales*, 27 F.3d 1054, 1062 (5th Cir. 1994) (citing *United States v. De Los Santos*, 810 F.2d 1326, 1336 (5th Cir. 1987)). To determine whether probable cause exists, "courts examine the totality of the circumstances." *Powell*, 732 F.3d at 372 (citing *Illinois v. Gates*, 462 U.S. 213, 234 (2012)). "Probable cause exists if, under the totality of circumstances, there is a fair probability that. . . an illegal act is taking place." *United States v. Thompson*, 2012 WL 1161609, at *3 (N.D. Tex. Apr. 9, 2012) (Fitzwater, C.J.) (citing *United States v. Newman*, 472 F.3d 233, 236-37 (5th Cir. 2006)). The court concludes that Salazar's confession that he had methamphetamine in his vehicle was sufficient to cause an officer of reasonable caution to believe that a criminal offense has been or is being committed. Accordingly, once Salazar confessed that he had methamphetamine in his vehicle and more drugs in his trunk, Trooper Honesto had probable cause to search the vehicle.

In sum, Trooper Honesto had reasonable suspicion of additional criminal activity that justified prolonging the *Terry* stop beyond the point at which he returned Salazar's license and registration and Salazar declined Trooper Honesto's request for consent to search the vehicle. And Trooper Honesto had probable cause that justified a warrantless search of the Maxima once Salazar admitted that he had drugs and drug paraphernalia in his vehicle. Accordingly, Salazar's Fourth Amendment rights were not violated, and the court denies his

motion to suppress.

                              *     *     *

For the reasons explained, the court denies Salazar's motion to suppress.

**SO ORDERED**.

April 6, 2017.


                              _____
                              SIDNEY A. FITZWATER
                              UNITED STATES DISTRICT JUDGE